21-5165 Gene Clayton Schaerr, Appellant v. United States Department of Justice, et al. Mr. Schaerr for the appellant, Mr. Poulin for the appellate. Good morning, Your Honors, and thank you for allowing us to speak to you without a mask today. The only issue the panel needs to decide is a legal question. That is, whether an agency can properly invoke the Glomar Doctrine, not just to refuse to disclose the existence or not of particular responsive records to a FOIA request, but to refuse even to search for any records covered by that request where, by its terms, the request sweeps more broadly than the records or information protected by any claimed FOIA exemption. A simple hypothetical, I think, will help verify what's at stake in this case and why the district court must be reversed. Let's suppose, just to take the FBI as an example here, that the FBI had conducted the search called for by the two FOIA requests that issue here and had found three documents about the unmasking of someone who's become famous in recent years, Carter Page. You'll recall that he was the subject of the famous FISA warrant that was later shown to have been the subject of a fraudulent FBI submission to the FISA court. Hypothetical document one, again, this is just hypothetical, describes how the CIA obtained from a still active foreign intelligence source properly classified information on Page, whose identity in association with that information was revealed to the FBI through an unmasking request from that agency to the CIA. That's the first hypothetical document. The second is a declassified document about Page, similar to the documents about the unmasking of General Flynn, that were famously declassified by the Director of National Intelligence in May of 2020. Hypothetical document three does not reveal any FISA-derived information, but is simply a one-sentence unclassified email from an FBI employee before any unmasking request to another agency, stating that there was no legitimate basis for seeking information on Page through FISA-derived information. So before we get to GLOMAR, what does FOIA itself require with respect to these three hypothetical documents? Well, first of all, the plain language of FOIA, again, we're not to GLOMAR yet, but the plain language of FOIA requires that the agency conduct a search for responsive records. With a technical exception that the agencies haven't invoked here, Section 552A3C of FOIA requires, and I quote, that in responding to a request for records, an agency shall make reasonable efforts to search for all records, or to search for the records. And, of course, that has to be interpreted in light of the Supreme Court's and this Court's frequent admonition that the disclosure obligations of FOIA are to be broadly construed. Section 552D of FOIA further makes clear that implied exceptions are out of bounds. It says this section does not. I'm sorry. Let me just interrupt you. I'm sorry. I'm sorry. I'm just, I'd like to follow your hypotheticals, but could you put, could you just explain in terms of your hypotheticals your argument about the GLOMAR? That's our first question. Yes. We have to decide whether the GLOMAR response is appropriate. Okay. Isn't that where we start? Well, I think it's, I do think it's important first to understand what the statute itself requires. Okay, I think we understand the statute. Okay, because. When we have an agency that has asserted a GLOMAR response, isn't the first question we ask, is the GLOMAR response sufficiently supported by the record, right? Well, that is true with respect to an agency claim that it can neither disclose, that it can't disclose any information about the existence of LMOC. That's what a GLOMAR response is. Well, here though, Your Honor, the agencies have put GLOMAR on steroids, and they've said not only does GLOMAR allow us not to disclose the existence or not of the documents, but they say GLOMAR does not even require us to search for those documents. Well, I guess what I'd like to know is what in the statute, what tells you, what in the statute would require, given our case law about GLOMAR responses, what would require an additional search? In other words, if the documents you've asked for about these 21 people are covered by the GLOMAR response, anything else, two questions. Number one, anything the agency finds about those 21 people would be covered by the GLOMAR response. And number two, what in the statute requires them to conduct an additional search once they've asserted a GLOMAR response? Well, I think on that point, Your Honor, PETA is a good example, the PETA decision from a few years ago. And that decision sustained GLOMAR responses as to some categories of documents that were responsive to a request. And, I mean, frankly, we think PETA was wrong to the extent that it excused the agencies from searching at all. PETA, that's the point of PETA. But what's important, we're not asking the panel to overrule PETA. Go ahead. But what's important about PETA is that PETA acknowledged that there were some responsive documents that were not. Can you give me an example of what kind of document could be responsive? Just give me a hypothetical. Well, I think the two hypotheticals that I gave you. My first hypothetical is obviously. Well, didn't the first one deal with Carter Page? Yes. So the GLOMAR response covers that. It's protected. It's one of the 2,100 people you asked for responsive, right? Yeah, the first one is protected under Exemptions 1 and 3. We acknowledge that. But the second hypothetical, a document that was classified, that's sitting in the agency's files and has been declassified, that can't possibly be the subject of a GLOMAR response. But what precisely is your GLOMAR? Your FOIA request is about these 21 people, right? I'm sorry, Your Honor, I couldn't quite hear you. I'm sorry. Well, let me ask you a different question. I asked you what authority you have for the proposition that an agency has to do a search even after it's asserted a GLOMAR response. You cite on page 19 of your brief, you cite 552A3C. And here's what you cite. It says, stating that an agency, quote, shall make reasonable efforts to search for, and then you have a bracket, responsive records, right? Right. Okay, but the language you've deleted and replaced with a bracket in the term, it said what the statute says is the agency shall make reasonable efforts to search for records in electronic form or format. Well, with respect, Your Honor, it says for the records in electronic. In electronic form or format. It's to make sure that an agency is not just searching for paper, but it's also looking for everything in digital form also. Right. And so this doesn't, to me, this doesn't in any way, please, maybe I'm missing your point. I don't see how this supports your argument that once an agency has invoked GLOMAR, it has to search further. Well, under PETA, unless the agency's affidavits have clearly covered the waterfront of potentially responsive documents, then under PETA, the agency is obligated to do a search for any documents that are not clearly covered by its affidavit. And that's the situation we have here. But your FOIA request, in relevant part, what your FOIA request seeks is documents about unmasking requests and upstreaming. And I'm not sure how your hypothetical response to that, because anything, the theory of the affidavits here is that any documents that reference these individuals during this specific timeframe in the context of either unmasking or upstreaming is going to reveal what records they were collecting or not at the time in this particular timeframe. And so a document that says we don't have any problem with unmasking, like that was your hypothetical, they wouldn't have that document, such a document, unless they for some reason had information on that hypothetical person. And it would reveal, again, what information they have collected in their records. And so I don't understand, I guess I'm not understanding how your hypothetical or your argument shows that there's anything, given the nature of your request, that falls beyond what the GLOMAR representations are here. Well, let's take this. If it's unmasking, or just more directly, sorry, if it's about unmasking or upstreaming, how could any document during this particular timeframe as to these particular individuals, which itself is very revealing, potentially, how could any record bearing on that not be covered by their GLOMAR? Well, again, it goes to the affidavits that were filed in support of the government's motion. And if you take an example, Mr. Hardy's affidavit on page 123 of the Joint Appendix, he characterizes the request, but clearly identifies only a subset of potentially responsive documents. He says, plaintiff's request for unmasking information about the identified individuals essentially seeks to reveal, A, whether the FBI possesses any FISA-derived intelligence information on them, B, whether the FBI disseminated any such intelligence information, and if so, C, whether the FBI unmasked the individuals' identities. The third hypothetical example that I give does not fall into that description. Again, in the hypothetical, it's merely an email from an employee saying, with respect to Carter Page, I've heard in the news or whatever that there might be some effort to unmask him. I don't think any unmasking would be warranted. That would not reveal any of those three things. That would reveal, that type of hypothetical would reveal that they've got documents on Carter Page. I don't, not in a hypothetical. They're not going to email about random names unless there's a reason for them to do it. Well, they may not have the information. They may think another agency has the information. For some reason, a particular agency, an intelligence agency, is talking about masking or unmasking Carter Page. I guess I'm having trouble understanding how that doesn't fall within their glomar. Well, again, one way would be if the intelligence resided in a different agency. They had read about it in the paper, and, you know, and the FBI employee says, look, this other agency may have this information. I don't think there would be a basis for us to see that. Well, them commenting about what they think other agencies are collecting or not collecting against him, to me, they raise the exact concerns flagged in the declarations. Well, but it doesn't fit. We don't have anything on Carter Page, but agency X might. Goodness gracious, that's clearly covered by glomar. We would agree that, right? Well, if an agency said, we don't have anything, but I think X agency might, that would fall within the glomar claim here, correct? It would not fall within this affidavit. This affidavit is more than that one page. In fact, this is really more definitional, and they talk about, yes. And there's lots of declarations here, too. No, I understand. But, again, the hearty affidavit that we were just looking at. Sure. My phrasing of it would show whether they possess intelligence information on Carter Page, because they go, we don't have any, or we're not sure we have any, or they disseminate it. Could be they send it to another agency, and that's why they're talking about another agency. Well, it's true that that kind of a document might reveal that information, but it may not. And until they've done a search, they don't know. How could it not? I mean, they're only going to search for things that are responsive to your request, which are about within their agency, so not speculation about other agencies, but within their agency, unmasking requests. Because your FOIA request is for unmasking requests and upstream collection, right? Right. Well, our request, too, was all documents concerning the unmasking or any request for unmasking of any person listed below. And it's not necessarily about information that resides in that agency. That's all agencies respond to under FOIA is what's in their own records.  They may have a record about information that does not reside in their agency. But if it's about Carter Page, it would be covered by the Global. And why would they have information in their records about Carter Page and some, I hate to use his name because we're all doing hypotheticals here, but Person X that Agency Y is interested in? That itself would be revealing. Sort of the nature of your request is focused on people who have been captured in agency records, and I think that's the point of their affidavits. Or who might have been captured. But again, if it's information that resides in another agency, it would be within the scope of the request, but not within the scope of the affidavits. Are you talking about some agency that's not one of the ones you sought FOIA requests from? No, it might be in the hands of another agency. Well, then let's look at that one's response. But a Justice Department employee talking about information that the FBI does not have or the Justice Department doesn't have, but they think some other agency might have, that falls within the scope of the request, but outside the scope of the affidavit that we have. Ms. Rao, I think you had a question. Mr. Chair, I mean, even if we follow your statutory argument, I guess I'd like to understand from you why you think that's consistent with our case law in Wolf and Epic and PETA. How do we follow your argument without effectively either undermining or overruling those earlier cases? Well, I think PETA points the way. PETA said there are some potential responsive documents to this request that are not covered by these affidavits. And so we're going to demand that the agencies at least search for those documents and see what they find. And it seems to me that's the appropriate outcome here, consistently with the statute and the case law. And whether PETA and Epic are correct interpretations of the law is a question for another day. But, again, we're not asking the panel to revisit that. You said that, under your hypothetical, it would reveal that the FBI doesn't have any documents on Person X. And that is the lack, the absence of documentation is itself covered by the global claim. Well, no, it wouldn't necessarily reveal that. I mean, the proper response, if they find that document in my hypothetical, the proper response would be to produce that document, if it's not otherwise protected, and then say, as the agencies often do, you know, there may well or may not be other documents that are responses, that they're protected under GLOMAR and Exemptions 1 and 3. I thought you said that document would say we don't have anything, but Agency X might. Sorry? I thought you said that document would say we don't have anything, but I think Agency X might. I'm not assuming that the document would actually identify another agency that has it. No, and we'll blank out the name of the agency. But the relevant part there is where it says we don't have anything. That is covered by the GLOMAR. With respect, that wasn't the hypothetical that I posited, where they say we don't have any. Simply something like, you know, I've read about this FISA-derived information that may be out there, and I don't think unmasking of Carter Page would be appropriate. Nothing more than that. So if this court can come up with some hypothetical document that's not covered by the affidavit, we have to send it back for more searches? Like if we can just conceive of any hypothetical document that might be covered? I mean, is that what PETA says? I'm not sure that that's how I read our cases. Yeah, I mean, I'm not. The reality is that the affidavits are narrower than the FOIA request, and I think the appropriate outcome is for the court to say, consistent with PETA, again, the appropriate outcome under the court's case is to say, consistent with PETA, you can assert a GLOMAR response, and you can avoid searching for documents that are covered by what you've outlined in your affidavit, but you can't avoid a search for documents that fall outside the terms of those affidavits. And that's all we're asking for at this stage, Your Honor. I'd like to ask you a question about a different argument you make. Okay. And specifically your argument that this record contains evidence of bad faith, right? And you cite the Sixth Circuit. What is it, Jones versus somebody? Are you aware of any cases in our circuit where, in a FOIA case, we look at the underlying bad faith, alleged underlying bad faith, as opposed to the bad faith of the federal officials responding to the FOIA request itself? I'm not sure I'm aware of any cases like that from this circuit, Your Honor. Thank you. But I do think that that principle articulated by the Sixth Circuit is correct under the plain terms of FOIA and under the Supreme Court's directive that disclosure obligations under FOIA are to be construed broadly. Thanks. Thank you, Your Honor. Good morning, and may it please the Court. Thomas Cullen for the Defendant Agencies. The plaintiff's FOIA request here seeks intelligence records indicating whether the names of 21 specified individuals were collected using covert surveillance authorized by FISA. The agency declarations explain why confirming or denying the existence of such records would reveal classified and statutorily protected information regarding intelligence sources and methods. This Court has repeatedly upheld LOMAR responses to requests for intelligence records regarding specific individuals. The District Court's judgment should therefore be affirmed, and I'm happy to answer any questions the Court may have. So I'm interested in what we do with this letter from Acting Director Grinnell, saying that the potential misuse of intelligence for partisan purposes following the 2016 election can safely be revealed without implicating sources or methods or national security. How can that be reconciled to the position of these affidavits? For example, in Steve Thompson, NSA must use a GLOMAR response consistently in all cases. Consistent use of GLOMAR is necessary to ensure its effectiveness, and yet we have a lack of consistency here. What are we supposed to do with that? It seems like there's a conflict between these two documents. Sure. Two points. First, I think the letter from former Acting Director Grinnell was specifically focused on declassifying the names of the individuals who sought to unmask General Flynn. So it was kind of a step removed from what we have here. Would his FOIA request not cover that? No, I don't think this FOIA request was about the names of requesters. I think it was about... We asked for documents about unmasking. Wouldn't that include the names of requesters? Potentially, but... I mean, I guess you'll tell me if I'm wrong, but I thought that would be covered by... I think the focus here was on the specific individuals who were detected in the surveillance, which was not, I think, the focus of Grinnell's letter. But more fundamentally, I'd like to point the Court to the Supreme Court's decision in CIA v. Sims. This is 471 U.S. 159. The Court said that intelligence agencies may sometimes find it advisable or even imperative to disclose information that may lead to the identity of intelligence sources. It's the responsibility of the Director of Central Intelligence. That was under the previous version. That refers to the DNI. Not that of the judiciary to weigh the variety of complex and subtle factors in determining whether such disclosure would be appropriate. And here's an essential point the Court made. The fact that Admiral Turner, who was a previous DCI, made that determination in 1978 does not bind his successors to make the same determination in a different context. So the Supreme Court... I get that, but this is very proximate in time, and it's not a different context. It is the exact same context, that is, interest in the potential misuse of intelligence for partisan purposes following the 2016 election. So it's the exact same context. Well, I think... Let's assume his FOIA request also encompasses getting the names of people that requested it. I think the context is a little different. One, because this involved General Flynn, about whom there had been a considerable public discussion about his role in communications with foreign agents. There's no similar issue here. This was not in response to a FOIA request. This was communications with Congress and an affirmative decision by the acting DNI to release information. As the Supreme Court recognized, there may be reasons to do that on a case-by-case basis, but one decision... Wait, so on a case-by-case basis? But you've got... I've got affidavits here. We've got to be consistent. So suppose the Director of National Intelligence released information, documents about unmasking, for half of the people on his list and then invoked GLOMAR for the other half. At that point, that's sort of selective on and off. The whole rationale for GLOMAR collapses, doesn't it? I don't think so. These are decisions that are permitted to the discretion of the intelligence agencies, who may have reasons in particular cases. Okay, so for 20 of his 21 clients, to get letters like this that say questions about potential misuse of intelligence for partisan purposes following the 2016 election can safely be released without implicating methods or sources or national security interests. For 20 out of 21. And then for the 21st, we get a GLOMAR response that says, we can say nothing, we can either confirm or deny. Anytime we talk about this, we reveal information. The rationale for GLOMAR, when you have selective, you selectively turn it on and off, it falls apart, doesn't it? I don't think it does. So you would say it would be fine in that case to assert GLOMAR for number 21, saying we can't say anything one way or the other to reveal whom we might have records on, even though we just did that for 20 other people involved in the exact same activity. We're supposed to just take that. I get we give them substantial deference, but at some point, the whole theory is collapsing here. And that's why I'm struggling with the granola. Even if we accept that at some point it collapses. Offering a single example with respect to someone who's not covered by the FOIA request, I don't think anywhere approaches that point that Your Honor is discussing. I get that. That's the reason I was changing the hypothetical. But why? Like, how far? How many is it? And in here, this rationale is not focused exclusively to Minister Flynn. Right. The theory is potential misuse of intelligence for partisan purposes following 2016 elections. So it's not a cabin letter in that regard as to what it's determined to be safe to release. But again, don't I need something? And I get that this happened after your declarations were all filed. And I think even after the district court ruled. But on this record, without some explanation from the agency is who I will actually. We normally mean what we say about Glomar, but we can we can selectively make exceptions. And how do we know that they shouldn't have to go back and look and decide whether they should make selective exceptions in this situation? Because we had six original classification authorities all come to the same conclusion here. With respect to these 21 names focused on these names, six different authorities all reached the same conclusion. Why does that matter? I bet you. I bet you. Were there any other agencies that were. Well, I don't want to ask. Never mind. But this is only one agency talking here. I don't. There may have been plenty of other agencies who would have thought, no, don't do that. But the director of national intelligence did it anyhow. But again, I think this goes directly to the Supreme Court statement that a decision by one holder of the office, as the Supreme Court said, does not bind to successors to make the same determination. I think the language you use was in different circumstances. Yes. And I think this is a different context. It involves different names that we don't have the same record about a kind of public discussion. Does it involve the same time period? It involves the same sort of inquiry in public discussion than in a media discussion. I think, well, different names and different focus. I mean, there was specific. The context of General Flynn, I think, was somewhat unique. That's what I'm starting to understand. So tell me how that one's unique. Because there was kind of widespread discussion and coverage about Mr. Flynn's communication in the media with foreign agents in the media, in government. I mean, this was a letter to the other case. I get that. But that was a revealing letter. So the government, the theory is that Mr. Flynn was different because there had already been public statements by government officials acknowledging that there were records on him. Is that what you're saying? I think what could be there are just different factors to weigh. And the fact that acting director Grinnell weighed them one way, even if he did so, I'm sorry, it doesn't undermine the ability of the government to protect this information. I appreciate that. I'm just trying to understand what those factors were. And I thought you said a widespread media coverage. It could be. But that can't be. The government never says there. There's always argued that media coverage does not affect in any way the ability of the government to maintain confidentiality because because official disclosures by the government are a totally different matter than media speculation or reports on unnamed sources. But so put aside the media stuff. So the other I thought you said the other factors. I think your honor referred to that this wouldn't affect the government's ability to keep it secret. That is not what's happening in this letter. This is not a compelled disclosure. This is a voluntary disclosure by the government. So nothing in here undermines the government's ability to maintain secrecy when it finds it important to do so. The statute, the National Security Act refers to unauthorized disclosures. The director of national intelligence can make an authorized disclosure. That's what's happening here. This was not in response to a FOIA request. This was the government deciding to make information public. And as the court said in Sims, the national interests sometimes make it advisable or even imperative to disclose information that may lead to the identity of intelligence sources. And that's a determination that was made here in this one instance. With respect to these other 21, the six classification authorities came to a different conclusion. And so I don't think consistent with Sims, the court could point to this one example involving a different person and say the government has forfeited the ability to assert a GLOMAR response. I appreciate that. But the difficulty is that the nature of GLOMAR, and I read you from Mr. Thompson's declaration, is that you can't pick and choose. We can't pick and choose whom we reveal information about and whom we can't. And the language there was consistency is critical. Consistency is essential to GLOMAR. And that's where I'm struggling because I don't think having consistency, and I understand that consistency argument, but pairing that with selective individualized decisions, doesn't that mean that you at least should have done the search in this case and decided whether you can make any of those selective individual decisions? Well, I mean, it certainly doesn't require a search. I mean... Does it require that you have made those individual decisions since that's... Well, I mean, the decisions were made. I mean, the original classification authorities looked at the FOIA request, which named 21 people, not one of which was General Flynn. And they looked at whether it would be appropriate to release, to respond in those circumstances. And even, I mean, this Court has recognized, has agreed that GLOMAR needs to be asserted consistently, but it has never suggested that a single disclosure undermines that rationale of consistency in GLOMAR cases. Indeed, this Court has considered cases involving official disclosures. It has a whole body of law about that. And it has never suggested that that body of law prevents agencies from invoking GLOMAR over similar information. So I have a different question. I want to ask you about Mr. Scherr's claim that the record reveals evidence of bad faith here. Sometimes in your brief, you say that the evidence he cites fails to prove bad faith, and elsewhere you say it's irrelevant to the question before us here. Which one is it? Well, I think we're advancing both arguments. One, that it's irrelevant, and two, even if it were irrelevant, it wouldn't satisfy me. I was kind of intrigued with the Sixth Circuit's approach. Let me just give you a hypothetical. Suppose, for example, I take your point that the record here, or at least I understand your argument, that the record here doesn't rise to the level of bad faith. But suppose you had a case where it was really, really clear, not only that there was some bad faith or even illegal behavior, but a bit of a cover-up of the underlying action. And then the agency subsequently issues a GLOMAR response in an affidavit. Wouldn't we be justified in questioning that affidavit given the underlying evidence of illegal behavior and cover-up? I guess what I'm asking is, one, isn't there an obvious connection there? And, two, can we do that under this circuit's case law? I don't think there's an obvious connection. I think these go to two different – there are two different inquiries. One is in GLOMAR, as Your Honor indicated earlier in questions, the relevant issue is the existence of documents Belmont. That is the only topic that's covered by these affidavits. But wouldn't we have some doubts about – I mean, the agency has to submit a declaration in support of its GLOMAR response. And we, as Judge Millett says, we defer to those, but, you know, we don't rubber stamp them. We don't just accept them as true without some thought. And if there was evidence that the underlying activities were being covered up, why wouldn't we question those declarations that at least require the agency to explain why the GLOMAR response is appropriate, notwithstanding the potential evidence? It just makes so much sense to me that they're related. Obviously, if the agency is covering it up, they're not going to turn it over in a FOIA response, in a FOIA response, right? Two things. One is I don't think it would directly controvert the subject matter of the affidavits, which is specifically about the GLOMAR issue, not the underlying. And there's been a statement that that determination of classification was not made to cover anything up, was not made for improper purposes. There's no evidence that would undermine that. No, but it's my hypothetical. There is evidence of a cover-up. Okay. But not with respect to the existence. No, but wouldn't it be? We're going around in circles. I'll just ask once more. Wouldn't it be? Let's assume the cover-up occurred six months ago, and now there's a FOIA request, and there's a declaration that says, you know, to reveal this information would risk revealing intelligence methods and techniques, right? Wouldn't we have some doubt that the same agency that's guilty of a cover-up has sworn, is trying to keep the information from becoming public because it says it's related to intelligence? Why wouldn't we? I'm not saying we would reject it. Wouldn't we scrutinize it somewhat more than the normal case? Well, I think perhaps to come at this another way, I mean, this court does have case law where there have been either assertions or actual declarations. I don't mean legal declarations. Yeah. Statements that certain intelligence conduct was unlawful. Also in ACLU versus Department of Defense, there was a request for documents about high-value detainees at Guantanamo. Yeah. The president in that case had declared that certain enhanced interrogation techniques were unlawful. This court said that the fact that the activities were deemed illegal does not diminish the government's valid authority to classify information about those techniques and conditions. So your answer to my second question, we can't go there in this circuit, right? Your point is, if I look at that case, which I remember, and others, this circuit has said that the bad faith has to be in connection with the response to the FOIA records, right? So we can't go where the Sixth Circuit went. Is that your point? I think that's the kind of combination of ACLU versus Department of Defense, Larson, which we also cited, which specifically asked whether there was bad faith in the withholding of documents, not specifically referred to the withholding of cables in that case. So I think when you put these things together, and this court's decision in Lazar, which involved records about the investigation of the Martin Luther King assassination, where it was accepted that the investigation had, the court said, gone beyond the bounds of its lawful security aim, that these could still produce information of a sensitive nature that could be withheld. Okay, one last question. When I was asking Mr. Scherer about his argument that the agency had to search notwithstanding the Glomar response, one of the hypotheticals he gave, he said, suppose there's an unclassified document in the record about, that's responsive to one of these. In other words, suppose it's just not classified. So a couple of responses. One, as a general matter, there can be documents that on their own would be unclassified, but the agency's possession of a document would be classified because it reveals something about the agency's interest or something. So that's a kind of general point there. And I just lost it. You said there were second points. I did have a second point. It just escaped my mind. It was quite persuasive. I'm sure. Come back to me in a minute. I apologize. Do you want us to wait or is that going to make you more uncomfortable? I'm sorry. It was a hypothetical about. Oh, I'm sorry. Unclassified. So then I think this court kind of touched on this in the Knight First Amendment case and its discussion of Wolf. There was an argument there that saying that an agency had responsive records might not reveal sources and methods because it could have been, say, an anonymous tip or some kind of press clipping or something. And this court said, you know, we have credited these concerns about revealing agency interests and capabilities, but without considering hypothetical scenarios like, for example, the possibility that the existence of responsive records might reflect nothing more than an anonymous tip or press clipping. So I think this court has made clear that that's not the approach it takes. It doesn't think about this potential unicorn of a document that might exist. It looks rather at the nature of the request, whether there are categories of documents whose existence would not reveal who the just, you know, categories of documents for which the normal response would not reveal protective information. And it proceeds on that basis. Thank you very much. Thank you. Cheryl, give you two minutes. Thank you very much. I think the exchange with counsel just illustrates the extremity of the government's position with respect to the Glomar. They're now saying that even if the underlying document is unclassified, or even if the underlying document is unclassifiable because it shows wrongdoing, that they can whitewash that just by asserting a Glomar response to protect the existence of the document. I mean, that, you know, that just takes Glomar completely off the statutory rails and makes it flatly inconsistent with the provisions of FOIA. When they have declarations that say all the information covered by the request, that's how when I read, just assume that's how I read the effort. With respect, that's not what they say, but go ahead. Okay. All right. I understand your argument on that. But in my hypothetical now, they say everything is covered. The FOIA request, it's all covered by our Glomar national security interests. And they say we've, and it's classified, and this isn't to cover up or embarrassment or any of those types of things. This is genuine concern. Doesn't our case law say it takes something of concrete from the FOIA plaintiff before we can start going, hang on, we can't take that at face value. I get, I mean, Glomar is just a really strong weapon for these particular agencies, a particular context. And we can't every time someone comes up and goes, well, that's too broad. There could be something in there. We can't go, okay, well, let's all look. So what I'm struggling with is how much is needed by the FOIA plaintiff, and I think we say significant evidence or substantial evidence. I assume you don't contest that. So, two, how is it met here? One, I assume you don't contest that standard, and let me know if you do. And, two, what do you have that is significant or substantial evidence that they're wrong in their assertion of Glomar? Well, two points, Your Honor. Let me just quickly address the mismatch between their affidavits and the request. And we heard from counsel today exactly what they've been doing with the request since the beginning. He began by saying that the FOIA requests here seek, quote, intelligence records about unmasking. And that's just not true. That's not what the request says. The request says all records about unmasking. They don't have to be intelligence records. And they do not in their affidavits, they don't have any provisions that say everything that's the subject of this request is subject to Glomar. They don't say, they just don't say that. They don't, you know, they don't say there is no category of documents within the scope of this request that, you know, as to which we would not be entitled to assert a Glomar response. So, what they're doing is they're taking a very broad request and they narrow it to a subset, and then they say we think we can legitimately assert Glomar as to that subset of documents, and therefore they conclude we can refuse to search for any documents that are responsive to the request. And that's just a big step beyond where this court has ever gone with Glomar. But to answer your more precise question about evidence of wrongdoing, I think in this case ‑‑ I'm not going to dispute that, but I do think that in this case, the Grinnell document that you mentioned earlier provides that. I mean, obviously, you know, correct? That long post states their declarations. So it doesn't reveal anything, that anything was wrong in how these declarations were made or decision made. It long post states, you know, it seems almost like a unicorn exception when it comes to the Glomar area, this disclosure. So it doesn't reveal anything other than someone came along a couple years later or a year, I don't have the exact time, a year, year and a half later, and as to one particular person made a different decision. So how is that bad faith, substantial evidence of bad faith? First of all, the court can take judicial notice of the Grinnell memo, and there are cases where the court has remanded to the agency for an additional search on the basis of evidence that has come to light since the affidavits were entered and even since the summary judgment decision was entered. And so we would urge the court to do that here. And the Grinnell letter does establish that there was misuse of intelligence information and misuse of surveillance against America. No, it says potential misuse, it does not establish misuse. It says potential misuse. That's different. I mean, maybe you'd be on stronger ground if they said this was a rotten thing, but that's not what they said, it's just potential. As I recall the letter, it was pretty clear that Grinnell had concluded that there was misuse of intelligence authorities against Americans. But he didn't say that, he said potential misuse. I mean, I just quote it. Anyway, I'll just conclude with the point that what is unique about this case is that it involves a redirection of surveillance authorities that are supposed to be directed against foreign persons and directing them against Americans. And at a minimum, that substantially reduces the agency's interest in protecting those materials from disclosure. And so we urge the court to act in accordance with FOIA's plain language, within the bounds of your precedent, obviously, as the panel, and to reverse summary judgment and send the case back to the district court. Thank you. Case is submitted.
judges: Millett, Rao, Tatel